FILED

2021 Feb-08  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| ANGELA COOK and WILLIAM COOK, <br><br> Plaintiffs, <br><br> v. <br><br> DEIGHAN LAW LLC, LAW SOLUTIONS CHICAGO LLC, and UPRIGHT LAW LLC, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No.:  1:20-cv-00457-CLM<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Plaintiffs Angela and William Cook ("the Cooks") hired Defendant UpRight Law, LLC ("UpRight") to help them file for Chapter 7 Bankruptcy.[1] But UpRight was anything but. Unknown to the Cooks, UpRight and a third party, Brian Fenner, had cooked up a national scheme that caused many of UpRight's clients to incur additional debt in order to finance their bankruptcy cases. The Cooks now bring a class action lawsuit against UpRight for violating the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1962(c) and (d), as well as 11 U.S.C. §526. But, as explained within, the Cooks waited too long to file their lawsuit, so the court must **GRANT** UpRight's motion to dismiss (doc. 12).

---

[1] UpRight Law LLC is the operating name of Deighan Law LLC, formerly known as Law Solutions Chicago LLC, the other named Defendants.

## STATEMENT OF THE FACTS

1. <u>The Fast-Fee Scheme</u>: UpRight teamed up with Fenner and Fenner's two companies—Fenner & Associates and Sperro LLC—to carry out what the Department of Justice has called "the Fast Fee Scheme." Doc. 1. The gist of the scheme is this: UpRight agreed to represent potential debtors in their bankruptcy cases in exchange for the debtors surrendering their vehicles to Fenner (by Sperro LLC). Once Fenner had the vehicle, he paid the debtors' attorney's fees to UpRight. Fenner would tow the vehicle to one of three States with unusual mechanic's lien laws and charge the debtors exorbitant towing and storage fees. Fenner would then exploit the States' liens laws by using the exorbitant fees to gain a mechanic's lien on the vehicles. Once Fenner had the lien, he would sell the vehicle at a "sham auction," so-called because the buyer in almost every instance was one of Fenner's business partners (who would typically pay the exact value of the mechanic's lien). Doc. 1. Fenner could then remove the lien, leaving the debtors still in debt to the bank. In the end, the debtors incurred more debt (because they had lost their car as collateral) as the price for UpRight handling their bankruptcy cases.

Though federal authorities eventually charged and obtained an indictment against Fenner for his role in the scheme, UpRight never faced criminal penalties. But both parties knew how the scheme worked, and many federal courts documented the cooperation between them. At least one court held UpRight's then-managing

partner responsible for the creation and implementation of the scheme, finding that UpRight intended the scheme to "increase the speed and likelihood of receipt of attorney fees." Doc. 1. (*Allen v. Fitzgerald, Tr. for Region Four*, No. 5:18-CV-00057, 2019 WL 6742996, at \*5–6 (W.D. Va. Dec. 11, 2019)).

2. <u>The Cooks</u>: The Cooks found UpRight on the Internet and contacted them in October 2015. In their initial conversation, UpRight advised the Cooks that if they would surrender their Nissan truck to Sperro LLC, Fenner would cover their attorney's fees.[2] UpRight then contacted Sperro to make an appointment for the Cooks to turn over their vehicle. Within days, the Cooks and Sperro entered into a Transporting and Storage Authorization Agreement ("TSAA") and a towing company picked up the vehicle on Sperro's behalf. Consistent with the scheme, Fenner had the Cooks' vehicle taken to Indiana, where Sperro charged excessive transportation and storage fees. Like other victims, the Cooks retained the debt on the truck but no longer had the truck itself to return to the bank as collateral. Once this happened, UpRight confirmed that Sperro had paid the Cooks' attorney's fees.

3. <u>The Bankruptcy Administrator's Inquiry</u>: A few weeks later, in November 2015, an UpRight partner named Mariellen Morrison ("Morrison") filed the Cooks' Chapter 7 bankruptcy petition. Doc. 12-2. Two months after that, in January 2016,

---

[2] UpRight didn't tell the Cooks that if they had surrendered the vehicle to Nissan itself, they would owe less on the car note.

the United States Bankruptcy Administrator for the Northern District of Alabama

("the BA") filed a "Motion to Examine Debtors' Transactions with Attorney, Order

Disgorgement and Other Relief" related to UpRight's representation of the Cooks

("the Cook Motion"). Doc. 12-1. Among other things, the BA asked the United

States Bankruptcy Court for the Northern District of Alabama ("the Bankruptcy

Court") to examine whether UpRight and Morrison's representation had violated 11

U.S.C. §§ 526(a) and 707(b)(4) and to order the disgorgement of all fees paid to

UpRight and Morrison. The Clerk of Court sent a copy of the Cook Motion to the

Cooks by United States Mail.

Besides noting that Morrison's initial Disclosure of Compensation form did

not accurately reflect the source of compensation to UpRight for representing the

Cooks (Morrison later amended the form to list Sperro as the payer after inquiry

from the BA), the BA "raise[d] questions about the scope of representation and

reasonableness of the attorney fees charged." Doc. 12-1. In particular, the BA

asserted that the contract between UpRight and the Cooks "exclude[d] routine

services which should be part of a flat attorney fee in a routine Chapter 7 case." *Id.*

The contract also obligated the Cooks "to pay for non-base legal services post-

petition at extraordinarily high hourly rates for routine consumer services [in the

Northern District of Alabama]." *Id.* The BA thus concluded that "absent a reasonable

explanation," any fee paid to UpRight was "excessive and unreasonable." *Id.*

Regarding the relationship between UpRight and Sperro, the BA stated that "it is unclear whether there has been any type of undisclosed sharing arrangement or referral fees." *Id.*

Two months later, in March 2016, the BA filed a "Complaint for Declaratory Relief, Disgorgement, Civil Penalties, Sanctions and Injunctive Relief" ("the Cook Complaint") against UpRight and Morrison. The Cook Complaint made many of the same allegations as the Cook Motion and sought civil penalties and injunctive relief under 11 U.S.C. § 526(c)(5). Unlike the Cook Motion, the record doesn't show whether the Clerk of Court sent a copy of the Cook Complaint to the Cooks themselves. Eventually, UpRight and the BA negotiated a settlement of the case.

4. This lawsuit: Nissan sent the Cooks a Notice of Deficiency in the amount of $14,355.15 in July 2016. The Cooks claim this notice made them aware, for the first time, that UpRight's scheme had injured them by causing them to incur more debt and have less collateral. Nissan later filed an unsecured claim in the Cooks bankruptcy case.

The Cooks filed this complaint against UpRight alleging violations of 11 U.S.C. § 526(a)(4) and RICO Act §§ 1962(c) and (d) ("RICO") in April 2020.

## STANDARD OF REVIEW

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, 'the-defendant-unlawfully-harmed-me' accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.*

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A complaint states a facially plausible claim for relief when the plaintiff pleads facts that permit a reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

**ANALYSIS**

UpRight makes several arguments for dismissing the Cooks' complaint. The court will only discuss one, because it is dispositive: the Cooks' failure to file their complaint within the statute of limitations.

**A. The Injury Discovery Rule**

Civil claims for relief under both RICO and § 526(c)(5) face a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); 28 U.S.C. § 1658(a) ("a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."). "The RICO statute of limitations begins running on the date that a plaintiff knew—or should have known—of the injuries that justify the allegations in the complaint." *Rotella v. Wood*, 528 U.S. 549, 554-55 (2000).[3]

In *Rotella,* the Supreme Court adopted this "injury discovery" rule, as opposed to the "pattern discovery" rule, for RICO claims. *Id.* at 560. The injury discovery rule starts the statute of limitations clock "when a plaintiff knew or should have known of his injury," *id.* at 549, while under the pattern discovery rule, "a claim accrues only when the claimant discovers, or should discover, both an injury *and* a

---

[3] Though neither party points to either a Supreme Court or Eleventh Circuit case holding as much, the Cooks do not contest that the same four-year statute of limitations and "notice of injury" standard that applies to RICO claims also applies to § 526(c)(5) claims. And "[f]ederal courts, to be sure, generally apply a discovery accrual rule when a statute is silent on the issue." *Rotella*, 528 U.S. at 555.

pattern of RICO activity." *Id.* at 553 (emphasis added). In rejecting the pattern discovery rule, the Supreme Court said that a RICO plaintiff's "ability to investigate the cause of his injuries is no more impaired by his ignorance of the underlying RICO pattern than a malpractice plaintiff is thwarted by ignorance of the details of treatment decisions or of prevailing standards of medical practice." *Id.* 556-57. That is, once they have reason to believe they have been wronged, RICO plaintiffs–as "private attorneys general"–bear some onus in uncovering whether the wrong is part of a larger scheme. *Agency Holding Corp.*, 483 U.S. at 151.

### B. When Was the Injury Discoverable?

The Cooks filed this lawsuit on April 3, 2020. Doc. 1. So the statute of limitations would bar the Cooks' complaint if the Cooks knew or should have known that they had been injured by the Fast Fee scheme before April 3, 2016.

1. <u>The parties' positions</u>: The Cooks define their injury as "the Fast Fee Scheme causing them to incur additional debt and to lose collateral" and argue that they first knew about this injury in July 2016 when Nissan sent them a Notice of Deficiency. Doc. 15. If they are right, then the complaint is timely.

But UpRight argues that two documents put the Cooks on notice of their injuries well before that: the October 2015 TSAA between the Cooks and Sperro LLC and the BA's Cook Motion filed in January 2016. As to the latter, UpRight says that the contents of the Cook Motion – which the Clerk of Court mailed to the Cooks,

along with a Notice of Hearing (docs. 12-1, 12-5) – put the Cooks on notice of their injury because it "was based primarily on allegations of wrongdoing related to UpRight's participation in the Sperro Program." Doc. 12.

As explained below, the court agrees with UpRight that the Cook Motion put the Cooks on notice in January 2016. So this Court will not address whether the earlier TSAA also put the Cooks on notice.

2. The Cook Motion: The BA was not kind to UpRight or Ms. Morrison in the Cook Motion. The BA identified several deficiencies in the Cooks' bankruptcy representation, including Morrison's failure to report the source of compensation for UpRight's services (which was Sperro LLC), an inaccurate statement of financial affairs that neglects to disclose the TSAA between the Cooks and Sperro, a failure to disclose the actual "terms of payment" required by § 528(a)(1), additional violations of §§ 526 and 707, and the likelihood that the attorney's fees charged by UpRight were unreasonable given the services offered. Doc. 12-1.

This last deficiency is crucial. In questioning the reasonableness of UpRight's fees, the BA declared that the contract between UpRight and the Cooks obligated the latter "to pay for non-base legal services post-petition at *extraordinarily high hourly rates* for routine consumer services." Doc. 12-1 (emphasis added). According to the BA, UpRight's representation was so insufficient it warranted "disgorgement of all fees paid to Morrison and Upright Law LLC." *Id.*

The Cooks knew that even though Sperro had covered these fees, they had surrendered their truck to Sperro as the cost of UpRight taking their bankruptcy case. The Cooks' complaint starting this case, in fact, characterizes this "advice and arrangement" as the reason they incurred more debt in anticipation of their bankruptcy petition, the basis of their § 526(a)(4) claim. Doc. 1. But the Cooks did not need the Notice of Deficiency from Nissan to tell them UpRight's representation had caused them injury "in [their] business or property": the BA said in the Cook Motion that the Cooks had been charged unreasonable fees. 18 U.S.C. § 1964(c). In other words, the "advice and arrangement" about which the Cooks complain in their April 2020 complaint is the same "advice and arrangement" the BA complained about in the January 2016 Cook Motion (and the March 2016 Cook complaint). The primary difference between the BA's motion and the Cooks' complaint four-plus years later is the Cooks' revelation of the complete Fast Fee Scheme.

But *Rotella* and its Eleventh Circuit progeny do not require the scheme to be complete before the statute of limitations begins running. *Rotella*, 528 U.S. at 555; *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013). Instead, they ask only for plaintiffs to have notice of their injury. Here, the Cook Motion makes clear that the fees UpRight charged–the fees that the Cooks surrendered their vehicle to have paid– were excessive barring a reasonable explanation. So once the BA filed the Cook Motion in January 2016, the Cooks knew—or had reason to know—that UpRight

had injured them. The Cook Motion even alleged violations of the *same subsection* as the Cooks' complaint (the Cook Motion discusses violations of § 526(a)(2), while the Cooks' complaint discusses violations of § 526(a)(4)).

Under *Rotella*, it doesn't matter that the Cook Motion "evidence[d] the confusion" surrounding the scheme, because the scheme is irrelevant to the statute of limitations. Doc. 15. Once the Cook Motion was filed, the Cooks had the "critical facts" that UpRight's proposed "arrangement" had hurt them. *Rotella*, 528 U.S. at 555 (citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979)). And at that point, in January 2016, the statute of limitations began running.[4]

In sum, the BA's filing of the Cook Motion to begin an investigation into the Cooks' case gave the Cooks ample reason to know or strongly believe that they had been injured and thus seek out further legal assistance to discuss remedies.

## C. Equitable Tolling

The Cooks also argue the statute of limitations ought to be equitably tolled. Doc. 15. This argument, too, is unpersuasive.

Equitable tolling may be available to a litigant who shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Pace v. DiGuglielmo*, 544 U.S. 408,

---

[4] At best, the Notice of Deficiency from Nissan represents notice of a "continuation" of the initial injury. *Pilkington v. United Airlines*, 112 F.3d 1532, 1537–38 (11th Cir.1997). Even if the injury they describe – "incurring additional debt and losing collateral" – is not the injury the Cook Motion describes, it stems from the same base injury, which was UpRight's misrepresentation/overcharging of fees and which the Cook Motion details.

418 (2005). But it "is an extraordinary remedy which should be extended only sparingly." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993). So courts ordinarily interpret the second prong as requiring extraordinary circumstances that "are both beyond [the movant's] control and unavoidable even with diligence." *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006). Under this framework, equitable tolling doesn't apply here.

The Cooks argue that they had no reason to seek legal assistance following the BA's filing of the Cook Motion because "they had already put their trust in UpRight" and "had the right to believe that UpRight would provide services with honesty, good faith, fairness, integrity, and fidelity." Doc. 21. But even the most forgiving reading of the BA's Cook Motion dispels any notion that the Cooks' trust was well-placed. While the Cooks are blameless for initially hiring UpRight to handle their bankruptcy case, once they knew that the Bankruptcy Administrator was investigating Upright for a shady fee agreement, the Cooks knew that their belief in UpRight was misplaced. After all, UpRight took their truck.

At that point, the Cooks knew or should have known that they needed different (more trustworthy) counsel to discuss their legal options. No "extraordinary circumstance" prevented the Cooks from doing so, *Pace*, 544 U.S. at 418, nor do the Cooks claim one. So equity does not toll the four-year statute of limitation.

## CONCLUSION

For the reasons stated above, UpRight's motion to dismiss is due to be

**GRANTED**. This court will enter a separate order carrying out this finding.

**DONE** this 8th day of February, 2021.

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE